UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| LOWELL CAVENDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:06-cv-664-JDT-WTL |
| | ) | |
| | ) | |
| SUNBELT RENTALS, INC., | ) | |
| | ) | |
| Defendant. | ) | |


**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 37)[1]**

The plaintiff in this case, Lowell Cavender sues his former employer defendant Sunbelt Rentals, Inc. for violations of the Family Medical Leave Act (the FMLA) and the Americans with Disabilities Act (the ADA).  Cavender argues that Sunbelt violated these Acts when Sunbelt fired him on January 16, 2006.  He alleges both substantive and retaliatory claims under the FMLA in connection with taking leave to care for his son and an ADA association claim keyed to his son's disability.  In response Sunbelt questions the applicability of the FMLA to the present parties and argues Cavender was fired due to attendance problems.

The matter is presently before the court on defendant Sunbelt's motion for summary judgment.  The court rules as follows:

---

[1]  This Entry is a matter of public record and will be made available on the court's web site.  However, the discussion contained herein is not sufficiently novel to justify commercial publication.

**I.  Summary Judgment Standard**

Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Material facts are those that, under the relevant substantive law, might affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of identifying for the court the evidence which it believes establishes the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  The evidence must show that the plaintiff has "failed to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322.  In response, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial," in order to avoid summary judgment.  Fed. R. Civ. P. 56(e).

The court's sole role, then, is to determine whether there is a genuine issue of material fact – if so, the case must proceed to trial.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . .  The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.

## II. Factual Background

Plaintiff Lowell Cavender (hereinafter Cavender) was employed by Sunbelt Rental, Inc. (hereinafter Sunbelt) as a truck driver.  Sunbelt rents and sells construction equipment from various profit centers. (Black Aff. ¶ 5.)  Cavender worked at profit center 312 (hereinafter PC 312) located in Indianapolis, Indiana. (Cavender Dep. 26; Black Aff. ¶ 6; McDonald Dep. 20.)  From January 1, 2005 to September 14, 2005, the only profit centers within 75 surface miles of PC 312 were PC 310 in Kokomo and PC 309 in Lafayette.  (Black Aff. ¶ 8.)  These two PCs together with PC 312 had a total of 38 employees on the payroll as of September 14, 2005. (*Id.* ¶¶ 9-11.)  On September 15, 2005, Sunbelt acquired another profit center within 75 miles, PC 394 in Fishers, adding 20 more employees. (*Id.* ¶ 12.)  This pushed Sunbelt over the 50 employee threshold found in the FMLA. (*Id.* ¶ 14.)  Sunbelt continued to have at least 50 employees for at least 20 weeks in 2006, including the time at which Cavender requested his FMLA leave.  (Pl.'s Reply Br. 2; Def.'s Answer Pl.'s Interrogs. 12 & 13; SB-Cavender-00600 - SB-Cavender-0063.)

Cavender was a member of the International Union of Operating Engineers, Local 103 (hereinafter Union).  (Cavender 21, 25.)  His employment at PC 312 began on August 9, 2004.  (Cavender 26; Black Aff. ¶ 6; McDonald 20.)  Steve McDonald (hereinafter McDonald) was the profit center manager and Cavender's direct supervisor.  (Cavender 25-26; McDonald 17-23.)  McDonald was responsible for hiring, firing, and employee discipline and is the person who hired (and fired) Cavender.  (McDonald 23, 81-89; Cavender 79-80.)  During his interview for the job, Cavender informed McDonald

-3-

that his son had a serious bone disease and that he would therefore need time off in order to care for him.  (Cavender 42-44.)  Throughout his employment Cavender did take time off to care for his son, as well as time off for his wife's and his own medical problems.  (Cavender 44, 46, 51-53.)  Cavender's benefits and insurance were not provided for by Sunbelt; Cavender was covered by the Union.  His son's medical bills were covered by his wife's insurance.  (Cavender 88.)

Toward the end of 2005, Cavender's absenteeism was noted as a problem. (McDonald 32.)  On November 22, 2005, McDonald, Cavender, Curt Balser (the Union Business Agent, hereinafter Balser), Chris Esteb (the Union steward, hereinafter Esteb), and two other Sunbelt Drivers had a meeting to respond to a few driver concerns including attendance and FMLA leave.  (Cavender 64-67, 105; McDonald 40-41; Balser Dep. 16-18; Esteb Dep. 14.)  McDonald stated that attendance needed to improve, especially because PC 312 was short-staffed and business would suffer if a driver failed to show up for work.  (Balser 49-50.)  McDonald also suggested to Cavender at this November meeting that he could consider FMLA leave or a leave of absence under Sunbelt's policy.  (McDonald 41.)  But, otherwise, if his absenteeism continued, he could face disciplinary action.  (McDonald 41.)

The Sunbelt employee attendance policy required employees to fill out a form or to make a request directly to the profit center manager in order to receive time off. (Handbook 4-5.)  On December 31, 2005, Cavender called in sick.  McDonald informed him that he had used up all of his paid leave.  (Cavender 55; McDonald 29.)  Cavender also alleges that he actually had this day off, because the Union's Collective Bargaining

-4-

Agreement provides that Union employees were to have a half day off on Christmas Eve and New Year's Eve; McDonald told the drivers they could work a full day on one of those days to get the other one off entirely.  (Cavender 55-57.)  Since Cavender ended up working all day Christmas Eve, he claims he had the 31st off.  Sunbelt was closed on January 1, 2006.  Monday January 2, 2006, Sunbelt was open for business.  However, Union employees were entitled to take the day off in recognition of New Year's Day, but, according to McDonald, they could only do so with his approval.  (Cavender 72; McDonald 45.)  Cavender did not show up for work on January 2; he had not made an advance request.  January 2 was also Cavender's birthday.  Union employees get their birthdays off.  Cavender was absent from work on January 3.  His view was that Union workers already had the 2nd off, so he took the 3rd off in observance of his birthday. Cavender claims to have given McDonald's secretary a form around Christmas requesting off for the 3rd.  (Cavender 72-74.)  McDonald denies ever receiving it. (McDonald 55-56.)

Cavender did work on January 4, 2007.  Cavender claims to have seen McDonald that day, but McDonald denies seeing Cavender.  (Cavender 118-19, 124-25; McDonald 68.)  In any event, they did not speak to each other.  While on his way home from work on the 4th, Cavender received a call from his wife Marissa Cavender (hereinafter M. Cavender) informing him that his son had broken his leg.  (M. Cavender Dep. 31-32; Cavender 47-48.)  The following morning, January 5, around 6 a.m., while Cavender was in the pre-op room with his son awaiting surgery, M. Cavender called McDonald to explain why her husband would be unable to work that day.  (M. Cavender

32; Cavender 47-48.)  She also requested FMLA forms at that time.  (*Id.* 36.)  During this conversation McDonald told her, "my only concern is getting loads in and out of here, and I need [Cavender] here to get these loads out of here.  Your concern is your son.  That's not my concern." (*Id.* 32-33)  Later that day M. Cavender picked up FMLA forms.  (Cavender 64.)

When Cavender turned in the FMLA forms on January 18, 2006, the forms indicated a need for leave from January 4, 2006 through January 16, 2006, with the possibility of intermittent leave from January 18 to February 22, 2006, for followup care and appointments for his son.  (Cavender Ex. 12.)  Cavender had informed McDonald in a telephone conversation that he would be returning to work on January 16, 2006. (Cavender 85.)

On January 16, 2006, Cavender reported for work and met with McDonald and Esteb, at which time McDonald terminated Cavender's employment with Sunbelt. (Cavender 79-80; McDonald 81-89.)  During the meeting, McDonald asked Cavender if he had his completed FMLA paperwork with him.  Cavender said that he did not, but that his 15 days to get paperwork from his son's doctor were not up yet, and that he was getting it at their next appointment.  (Cavender 79-80.)  McDonald also gave Cavender seven warning forms for the following attendance problems: calling in sick on December 31, 2005 after having used up all paid time off; failing to notify McDonald that he would be absent on January 2; for being absent on January 2; failing to show up on January 3 after having used all paid time off; for failing to notify McDonald that he would be gone on the 3rd; for failing to show up for work on January 5; and for failing to notify

McDonald that he would be absent on January 5.  (Cavender Dep. Ex. 4, 5, 6, 7, 8, 9,

10.)  McDonald told Cavender that he was welcome back if he got "his problems cleared

up."  (Cavender, 48.)

Cavender filed a grievance with the Union immediately on the 16th.  (Cavender

Dep. Ex. 14.)  After discussing the grievance and the entire matter with Balser,

McDonald offered to reinstate Cavender on January 22, 2006.  (Cavender 62;

McDonald 98-100, 104-106; Balser 30.), but only on the condition that he begin work

the next morning.  (McDonald 103; Cavender 62.)  Cavender, along with his wife and

son, already had a meeting scheduled with their bankruptcy attorney for that day.

(Cavender 62.)  Cavender rejected the offer of reinstatement and ultimately agreed to

resign in exchange for Sunbelt's not contesting his request for unemployment

compensation and agreeing to pay him for the week he took off to take care of his son

and the day he took off for his birthday.  (Cavender 69-71, 113-14; McDonald 99-100.)

## III.  The FMLA Claims

### A.  FMLA Applicability[2]

Sunbelt argues that Cavender is not an "eligible employee" and Sunbelt is not an

"employer" under the FMLA, and, thus, the FMLA does not apply in this case.

However, under the plain language of the statute, it appears that Cavender does qualify

---

[2]  The court agrees with Cavender, that this court has proper subject matter jurisdiction. *See Smith v. Castaways Family Diner*, 453 F.3d 971, 973 (7th Cir. 2006) (finding that a similar requirement in Title VII was not a jurisdictional issue); *see also Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006).

as an "eligible employee" and Sunbelt as an "employer."

### 1. How to Read the Statute

The FMLA definitions section, 29 U.S.C. § 2611, contains definitions for "employer" and "eligible employee."  However, both parties frequently conflate the "employer" and "employee" requirements in their briefs, treating them essentially as if they were one and the same.  For example, one party states, "In order to be eligible for FMLA leave, the employee must be employed at a work site within 75 miles of which the employer employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year."  (Def's. Br. 18)  As delineated in the following sections, the 75 mile requirement for the 50 employees is only included in the "employee" definition, while the "20 or more calendar workweeks in the current or preceding calendar year" requirement for the 50 employees is only included in the "employer" definition.  Thus, while the two definitions are similar, they are two distinct definitions containing different language.  Treating them as one creates a misstatement of the law.[3]

The importance of evaluating the two requirements separately is perhaps best understood by considering an example.  One can imagine an employer having 50 employees for 20 workweeks in 2004, yet all of them are over 75 miles away from the

---

[3] Of course, the "employer" definition could be plugged into the use of the word "employer" in the "eligible employee" definition creating in effect a single employer/employee requirement.  However, neither plaintiff nor defendant did that accurately and instead seemed to treat them as if the two requirements were the same thing.

relevant worksite – this employer would still satisfy the definition of "employer" under the Act.  Furthermore, that same employer could have 50 employees within 75 miles of the relevant worksite but only for a few weeks in 2005 – and if in that time a claimant files for FMLA leave, then the employee is an "eligible employee," because he is employed by a covered employer and works at a site that has 50 employees within 75 miles.  The two requirements can be satisfied independently.  This hypothetical is one of many plausible scenarios demonstrating that it is critical to track the precise language of the statute.

Unfortunately, the arguments and  the evidence put forth by both parties in the instant case appear to be presented as though the 50 employees required for 20 workweeks in the current or preceding calendar year had to be within 75 miles.  This deficiency alone could lead the court to conclude that an issue of material fact exists as to the applicability of the FMLA to the current case.  However, the court, even on the evidence as presented, finds additional support to deny Sunbelt's argument that the FMLA does not apply.

### 2.  Sunbelt Is an "Employer"

The critical issue here is really one of statutory construction.  The FMLA defines "employer" in relevant part[4] as follows:  "any person engaged in commerce or in any

_____

[4]  The full language of the FMLA "employer" provision:
(4) Employer
(A) In general
The term "employer"--

(continued...)

industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year."  29 U.S.C. § 2611(4)(A)(i).

The alleged FMLA violations in the present case occurred in January of 2006 when McDonald fired Cavender.  Thus, 2005 is the "preceding calendar year" and 2006 is the "current calendar year."  Sunbelt did not have 50 or more employees at any point in 2005 until September 15.  The workweeks from that point until the end of the year number only 15.  Thus, Sunbelt did not have the requisite 50 employees for 20 workweeks in the "preceding calendar year."[5]  Sunbelt also alleges that it did not have 50 employees for 20 workweeks in the "current calendar year," because only the weeks of the "current calendar year" up to the time of the alleged violation can be counted.

---

[4](...continued)
        (i) means any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year;
        (ii) includes--
                (I) any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer; and
                (II) any successor in interest of an employer;
        (iii) includes any "public agency", as defined in section 203(x) of this title; and
        (iv) includes the Government Accountability Office and the Library of Congress.
(B) Public agency
For purposes of subparagraph (A)(iii), a public agency shall be considered to be a person engaged in commerce or in an industry or activity affecting commerce.
29 U.S.C. § 2611(4).

[5]  Sunbelt here appears to be counting only employees within 75 miles.  As explained at length above, 75 miles is not relevant to determine *employer* coverage.  If Sunbelt had enough employees over a broader area, it is quite conceivable that it had enough employees for the requisite time in 2005, the "preceding year."  However, since the court would reach the same result and since both parties appear to only be counting employees within 75 miles, the court is treating these employee numbers as totals.

And since there are, obviously, not 20 weeks before the events occurred in January of

2006, Sunbelt argues it simply is not an "employer" under the Act.  However, Cavender

responds by claiming that "current calendar year" covers the *entirety* of 2006.  It is

undisputed that Sunbelt had more than 50 employees for 20 calendar workweeks when

counting all of 2006.  The critical question before the court, then, is the precise meaning

of "current or preceding calendar year."

There does not appear to be any precedential case law specifically construing

this language from the FMLA.  However, other statutes contain substantially identical

language defining "employer," including Title VII and the Age Discrimination in

Employment Act ("ADEA"), among others.  The ADEA, for instance, defines "employer"

as "a person engaged in an industry affecting commerce who has twenty or more

employees for each working day in each of twenty or more calender weeks in the

current or preceding calendar year."  29 U.S.C. § 630(b).  Other courts' evaluations of

these markedly similar statutes guide the court in this case.  The Seventh Circuit in

*Rogers v. Sugar Tree Products*, 7 F.3d 577, 580-81 (7th Cir. 1993) (abrogated on other

grounds), held, in an ADEA case, that the term "'calendar year' means the period

between January and December," and that "[t]he current year is the year in which the

alleged violation occurred, and the applicable period does not cease on the date of the

violation but rather continues until the end of the calendar year."  *Id.*  Other courts

support this plain-meaning interpretation.  *See, e.g.*, *Slack v. Havens*, 522 F.2d 1091,

1094 (9th Cir. 1975) (superceded by statute on other grounds) (rejecting, in its

discussion of the "employer" requirement of Title VII, the argument that the statute

required "50 employees for a total of 20 weeks during the prior calendar year and only those months of the current year preceding the incident at issue"); *Jensen v. Johnson County Youth Baseball League*, 838 F. Supp. 1437, 1441 (D. Kan. 1993) ("The literal meaning of the term "calendar year" is the period of twelve months between January 1 and December 31."); *E.E.O.C. v. Metro. Atlanta Girls' Club, Inc.*, 416 F. Supp. 1006, 1011-12 (D.C. Ga. 1976).  Following these cases, "current calendar year," as used in the FMLA, would include the entire period between January 1, 2006 and December 31, 2006, regardless of when the alleged violation occurred.

Sunbelt does, however, point out a fundamental flaw in this construction – it requires an employer to somehow know in advance how many employees it would have for the rest of the year.[6]  An employee might request FMLA leave in January, but at that time, the employer may not know if it is even obligated to provide FMLA benefits:  will it have 50 employees for 20 weeks at some point in the 12 months to come?  Not knowing whether it is even covered by the Act, it is indeed odd to nonetheless require the employer to make correct decisions granting and denying FMLA leave.

This court is not unsympathetic to the inherent logic of this argument that requiring an employer to somehow predict whether or not it will be an FMLA "employer"

---

[6]  Other oddities result from this construction as well.  For instance, it is strange that an employer could have 50 employees for 19.5 workweeks in a year, but nevertheless, the count begins anew in January.  This system of counting could result in defining employers of summer seasonal employees as "employers" under the Act, yet those hiring winter seasonal employees can escape FMLA requirements altogether – despite the fact that both employers hired the same number of workers for the same number of weeks.

is somewhat unreasonable.[7]  Nevertheless, this court considers itself bound by *Rogers*, 7 F.3d at 580-81, construing *identical* language with a plain-meaning approach. Accordingly, under the plain language of the statute, 20 workweeks in the current calendar year encompasses January 1, 2006 through December 31, 2006.  Since Sunbelt admits to employing 50 employees for 20 weeks within that time frame, Sunbelt is an "employer" under the FMLA.

### 3.  Cavender Is an "Eligible Employee"

The definitions section of the FMLA dictates that an "eligible employee" must have been employed for at least 12 months by the employer from whom he is requesting leave and for at least 1,250 hours of service within the previous 12-month period.  29 U.S.C. § 2611(2)(A).  No one disputes that Cavender meets the requisite number of months and hours.  The point of contention is whether Cavender falls into an "exclusion" in the statute expressly providing that "eligible employee" does not include an "employee of an employer who is employed at a worksite at which such employer employs less than 50 employees if the total number of employees employed by that employer within 75 miles of that worksite is less than 50."  29 U.S.C. § 2611(2)(B)(ii).[8]

---

[7]  Although in this case Sunbelt is not a particularly sympathetic party to make this point – having recently acquired a new PC and having been over the 50 employee mark for the last 15 weeks of 2005, it was not unreasonable for Sunbelt to anticipate the applicability of the FMLA.

[8]  The full language of the statute:
(2) Eligible employee
(A) In general
The term "eligible employee" means an employee who has been employed--
    (i) for at least 12 months by the employer with respect to whom leave is
(continued...)

-13-

"Whether 50 employees are employed within 75 miles to ascertain an employee's eligibility for FMLA benefits is determined when the employee gives notice of the need for leave."  29 C.F.R. § 825.110(f).  The evidence indicates that Sunbelt employed 50 employees within 75 miles of Cavender's worksite at the time he requested FMLA leave in January of 2006.  Accordingly, since Cavender meets all of the "employee" requirements and none of the exclusions, he is an "eligible employee."

### 4.  The FMLA Applies; Equitable Estoppel Not Reached

Under the plain language of the statute, Sunbelt is an "employer."  Similarly, Cavender meets the requirements of an "eligible employee."  Therefore, Sunbelt's argument that the FMLA is inapplicable fails.  Because of this conclusion, the court does not reach the equitable estoppel argument.

### B.  FMLA Violations

---

[8](...continued)
      requested under section 2612 of this title; and
      (ii) for at least 1,250 hours of service with such employer during the previous
      12-month period.
(B) Exclusions
The term "eligible employee" does not include--
      (i) any Federal officer or employee covered under subchapter V of chapter 63 of
      Title 5; or
      (ii) any employee of an employer who is employed at a worksite at which such
      employer employs less than 50 employees if the total number of employees
      employed by that employer within 75 miles of that worksite is less than 50.
(C) Determination
For purposes of determining whether an employee meets the hours of service requirement specified in subparagraph (A)(ii), the legal standards established under section 207 of this title shall apply.
29 U.S.C. § 2611(2).

The FMLA offers two general types of protection – prescriptive and proscriptive. 29 U.S.C. § 2615(a)(1) & (2); *see Thomas v. Pearle Vision, Inc.*, 251 F.3d 1132 (7th Cir. 2001); *King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999).  The prescriptive type protects employees from substantive violations of the act, such as an improper denial of leave or a failure to reinstate the employee upon return.  These are alleged violations of 29 U.S.C. § 2615(a) and are also known as interference claims. The proscriptive type protects employees from retaliation or discrimination for exercising their FMLA rights.  These claims, also known as retaliation claims, are alleged violations of 29 U.S.C. § 2615(b).  Cavender presents arguments under both theories.

### 1.  Retaliatory Discharge Claim

Cavender alleges that Sunbelt fired him on January 16, 2006, in retaliation for taking FMLA leave.  In contrast, Sunbelt claims that Cavender was fired due to his attendance problems.

### a.  The Law of Retaliatory Discharge

A claim of retaliatory discharge[9] focuses on intent.  *King*, 166 F.3d at 891 ("[T]he question of intent is relevant.  The issue becomes whether the employer's actions were motivated by an impermissible relatiatory or discriminatory animus.")  A plaintiff can establish this using either of two methods – the direct or the indirect.  *Sylvester v. SOS*

---

[9] "We evaluate a claim of FMLA retaliation the same way that we would evaluate a claim of retaliation under other employment statutes, such as the ADA or Title VII."  *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th 2004).  Therefore, cases decided under those statutes are applicable to Cavender's FMLA claim.

*Children's Villages Illinois, Inc.*, 453 F.3d 900, 902 (7th Cir. 2006); *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002).  Under the indirect method of proof, a plaintiff must make out a prima facie case, at which point the defendant can come forth with a nondiscriminatory reason for the discharge.  *Stone*, 281 F.3d at 644.  The burden then shifts back to the plaintiff to show that this purported reason was pretext.  *Id.*  This framework is an adaptation of the well-known *McDonnell Douglas* burden-shifting method.  *Id.*  Cavender, however, does not attempt to make his case using the indirect method, rather he uses the direct method.

Under the direct method, a plaintiff must show that (1) he engaged in a statutorily protected activity, (2) the employer took a materially adverse action, and (3) a causal exists connection between the two.  This method of establishing a retaliatory discharge can be done using either direct or circumstantial evidence.  *Sylvester*, 453 F.3d at 902-04 (clarifying "dicta" to the contrary in *Stone*).  Cavender is making out his case with circumstantial evidence.  Some Seventh Circuit opinions suggested that a "convincing mosaic of circumstantial evidence" was required to establish the causal connection via circumstantial evidence.  *E.g.*, *Troupe v. May Dep't. Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994).  More recent clarifications, however, show that such a "rich mosaic" is not necessary.  Rather, to survive summary judgment, the plaintiff must only produce evidence sufficient for a reasonable jury to conclude that the protected activity was a cause of the retaliatory discharge.  *Sylvester*, 453 F.3d at 903-04.

Unlike the indirect method, the direct method is "unrelated to *McDonnell Douglas*," and accordingly does not follow the same burden shifting pattern.  *Stone*, 281

-16-

F.3d at 644.  As the Seventh Circuit explained,

> The fact that the defendant may be able to produce evidence that the plaintiff was fired for a lawful reason just creates an issue of fact: What was the true cause of the discharge?  Evidence, though not conclusive, that the cause was retaliation should be enough to entitle the plaintiff to a jury trial unless the defendant can produce uncontradicted evidence that he would have fired the plaintiff anyway, in which event the defendant's retaliatory motive, even if unchallenged was not a but-for cause of the plaintiff's harm.

*Id.* at 643.  Therefore, it is not enough for a defendant to merely assert a nondiscriminatory reason for the discharge – the defendant can only succeed on his motion for summary judgment by producing "uncontradicted evidence" that he would have fired the plaintiff anyway.

### b. Cavender's Prima Facie Case

Cavender can successfully make out his prima facie under the direct method.  He engaged in "statutorily protected activity" in taking FMLA leave.  Sunbelt took an "adverse employment action" when McDonald fired Cavender on January 16, 2006.  The only contentious issue, then, is causation.

Cavender uses circumstantial evidence to make his case.  In other cases, examples of such circumstantial evidence have included suspicious timing, ambiguous statements, behavior toward and treatment of other employees, evidence that the plaintiff was qualified but replaced by someone without the characteristic in question, or that the employer's stated reason for the treatment was pretext.  *Troupe*, 20 F.3d at 736.  All that is required is enough evidence for a jury to reasonably conclude Sunbelt

-17-

fired Cavender because he took FMLA leave.  *See Sylvester*, 453 F.3d at 903-04.

There is suspicious timing between Cavender's requested leave and his discharge.  Cavender could not succeed if timing alone made up his entire arsenal of circumstantial evidence.  *Buie*, 366 F.3d at 506 ("By itself, temporal proximity would not normally create an issue of material fact as to causation.")  But "[c]lose temporal proximity . . . may permit a plaintiff to survive summary judgment provided that there is also other evidence that supports the inference of a causal link."  *Lang v. Illinois Dep't. of Children & Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004).  McDonald fired Cavender the day he was to resume work following his leave.  The temporal proximity could hardly be any closer.  Moreover, discussion of whether Cavender had yet to complete his FMLA paperwork directly preceded the actual notice of termination.  This is certainly "suspicious timing."

Related to the proximity between the leave and the discharge, is the timing of the disciplinary notices for other absences.  No one disputes that Cavender has had at least some attendance issues, yet it seems a little too convenient that Sunbelt via McDonald finally decided to take severe action at precisely the time Cavender took leave.  McDonald gave Cavender seven disciplinary actions on January 16, 2006, for absences on December 31, January 2, January 3, and January 5.  Giving seven notices for four absences alone might suggest that someone is manufacturing a disciplinary paper trail.  Additionally, Cavender was at work on January 4, but did not receive any of these notices at that time.  Instead, McDonald issued them at the time Cavender returned from leave and was fired.

-18-

Also there is a case to be made that each of these absences was permissible –
Cavender argues that he, as a Union member, was permitted to take off the 31st
because he worked Dec. 24th; that the 2nd was a Monday holiday in recognition for
New Year's on Sunday; and that he requested off the 3rd, as Union members are
entitled to do, in recognition of his birthday; and finally January 5 was the day his wife
called to explain that he was in pre-op with his son, not to mention the fact that his
FMLA leave request ultimately covered the 5th.  Making the justifiable inferences most
favorable to Cavender, it would be quite reasonable for a jury to conclude that
McDonald and Sunbelt are piecing together evidence in order to legitimize what, in
reality, is a retaliatory discharge.  Certainly, many different, less incriminating,
inferences could be drawn as well, but these facts could be interpreted by a jury as
circumstantial evidence of causation.

Also, McDonald made some less-than-angelic statements when M. Cavender
called in requesting the FMLA paperwork on January 5, 2006.  He said "my only
concern is getting loads in and out of here, and I need [Cavender] here to get these
loads out of here.  Your concern is your son.  That's not my concern."  These
statements demonstrate McDonald's frustration and anger about Cavender's upcoming
absences.  That might at first sound reasonable, but Cavender's upcoming absences
were in fact his FMLA leave.  McDonald is stating that he is only concerned about
Cavender showing up at work.  Once on leave, Cavender was, of course, not going to
show up for work.  Therefore, these statements can be taken as circumstantial evidence
that McDonald fired Cavender in retaliation, because by taking the leave, he would not

-19-

be at work moving McDonald's loads.

Sunbelt, in its brief, explains that these statements to M. Cavender were not invidious or discriminatory toward the Cavendar family.  Sunbelt argues that since McDonald both hired and fired Cavender, at all times aware of his son's condition, then there is an inference against discrimination.  The brief also discusses the many ways in which McDonald was "sympathetic" to the condition of Cavender's son.  However, this entire line of argument is unresponsive to the claim of retaliatory discharge for taking FMLA leave.  It is entirely likely that McDonald was indeed sympathetic to Cavender's situation regarding his son and that his statement "[your son] is not my concern" was not a personal attack, but rather a statement in frustration about the realities of McDonald's job responsibilities.  Important, however, is the fact that the allegation is retaliatory discharge in response to Cavender's taking FMLA leave, *not* retaliatory discharge in response to his son's condition.  Sunbelt's arguments on those points are irrelevant to the actual charge.  McDonald's statements to M. Cavender suggest precisely that McDonald was upset that Cavender would be on leave.  It would not be unreasonable for a jury to take these comments as circumstantial evidence establishing the causal link between Cavender's taking leave and McDonald's firing.

There is sufficient circumstantial evidence for a reasonable jury to conclude that the protected activity, requesting and taking FMLA leave, was a cause of an adverse employment action, Cavender's discharge.  Thus, Cavender has a prima facie case for

retaliatory discharge.

### c. Sunbelt Did Not Respond with "Uncontradicted Evidence"

Additionally, Sunbelt cannot produce the requisite "uncontradicted evidence" that it would have fired Cavender anyway.  *Stone*, 281 F.3d at 643.  Sunbelt claims to have fired Cavender because he was not meeting Sunbelt's expectations due to his attendance problems.  The court does not doubt that this would be a legitimate reason to discharge an employee.  However, this allegation merely presents a question of fact for the jury.  Sunbelt has not provided "uncontradicted evidence" that it would have fired Cavender anyway.  As discussed above, questionable circumstances surrounding the timing of the discharge, concerns with respect to the timing, legitimacy, and sincerity of the disciplinary notices, and McDonald's comments to M. Cavender are sufficient to create an argument that Sunbelt's purported reason for firing Cavender is not the true reason.  Additionally, Sunbelt's offer to rehire Cavender on January 22, 2006, also casts some doubt on this argument – if his attendance problems were genuinely so extreme to warrant firing, why would the employer offer to rehire the unqualified employee?  Again, many other inferences can be drawn from the facts.  But, Sunbelt's explanation for firing Cavender has not risen to the level of "uncontradicted evidence"

 that he would have fired Cavender anyway.  There is a question of fact for the jury as to the cause of the discharge.

Therefore, Sunbelt's motion for summary judgment on the FMLA claim of retaliatory discharge is **DENIED**.

### 2. Substantive FMLA Claim

Cavender also presents an argument that Sunbelt violated a prescriptive protection of the FMLA, a substantive violation.  This argument is not as well developed by the parties.  In Cavender's Complaint, it appears as though the argument is that Sunbelt failed to properly reinstate him following his leave.  In Cavender's brief, however, the argument focuses more on the fact that he was not given 15 days to submit the FMLA paperwork from his son's doctor.  Sunbelt, in its briefs, does not directly attend to this argument, aside from arguing Sunbelt is not an FMLA "employer."

It seems as though Cavender is arguing that Sunbelt's failure to reinstate him when he returned to work on January 16, 2006 following leave was a violation of 29 U.S.C. § 2615(a)(1).  In other words, Sunbelt denied Cavender his right under the statute to return to work following his leave.  Unlike the claim for retaliatory discharge, intent is not relevant to this argument; therefore, in establishing a prima facie case, it matters not what Sunbelt's motivation was.  *Rice*, 209 F.3d at 1017-18; *King* 166 F.3d at 891.  Cavender simply must show by a preponderance of the evidence that he was

eligible for the entitlement, but was nevertheless denied.  *Rice*, 209 F.3d at 1017-18; *King*, 166 F.3d at 891.

Cavender established that he requested FMLA leave when his wife asked for the paperwork on January 5, 2006, while Cavender was in pre-op with his son.  This complies with the methods in 29 C.F.R. § 825.303(b), which permits a spokesperson, such as a spouse, to give notice of the need for leave if the employee is unable to personally.  Since his son's particular leg-breaking event was not foreseeable, Cavender's failure to give advance notice of leave is of no consequence.  *See* 29 C.F.R. § 825.303(a) ("When the approximate timing of the need for leave is not foreseeable, an employee should give notice to the employer . . . as soon as practicable under the facts and circumstances of the particular case.").  Cavender gave Sunbelt notice early on January 5, 2006; this seems quite reasonable given the circumstances.  Later, Cavender informed Sunbelt that he would return to work on January 16, 2006. Cavender did not have his complete FMLA forms turned in until January 18, 2006, but according to 29 C.F.R. § 825.305(b), Cavender had 15 days to obtain completed paperwork from his son's doctor.  Once turned in, the forms showed that he requested leave from January 4, 2006 to January 16, 2006 with possible additional intermittent leave from January 18 to February 22, 2006, for appointments.  On these facts, Cavender has complied with his FMLA duties.  Nevertheless, when Cavender returned to work on the 16th, Sunbelt did not reinstate him.  According to Cavender, McDonald asked him "Do you have your FMLA paperwork on you?"  After

Cavender said he did not, McDonald said, "Well, I'm going to have to let you go."  This appears to violate 29 U.S.C. § 2615(a)(1).

With respect to this specific argument, Sunbelt never expressly presented evidence or argument for why it should be granted summary judgment.  Presumably, Sunbelt's position is that it terminated Cavender on the 16th due to his attendance problems.  If so, then Cavender's argument fails, because he would not be entitled to reinstatement if he were terminated for other reasons.  *See* 29 C.F.R. § 825.216(a) ("An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment."); *see also*, *Rice*, 209 F.3d at 1018.  However, this argument is essentially the same argument put forth in response to the retaliatory discharge claim.  And, as with that argument, there is a question for the jury as to whether Cavender would "not otherwise have been employed" at the time he requested reinstatement on January 16, 2006.

Sunbelt's motion for summary judgment with respect to the substantive FMLA claim is **DENIED**.

## IV.  ADA Violation

Cavender also alleges that Sunbelt violated the "association" provision of the ADA which forbids "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association."  42 U.S.C. § 12112(b)(4).  To make out his prima facie case, Cavender must show that (1) he was qualified for the job at the time of the adverse employment action; (2) he was subjected to an adverse

employment action; (3) the plaintiff was known by his employer at the time to have a relative or associate with a disability; and (4) his case falls into one of the three relevant categories. *Larimer v. Int'l Bus. Machs. Corp.*, 370 F.3d 698, 700-02 (7th Cir. 2004).

These three categories "in which an employer has a motive to discriminate against a nondisabled employee who is merely associated with a disabled person," *id.* at 702, are "expense," "disability by association," and "distraction." *Id.* at 700. The expense category, for example, would cover a situation where an employer fired an employee whose spouse had a disability that would cost the employer because he was covered by the employer's health plan. *Id.* The "disability by association" category would include scenarios like an employer firing an employee whose child has a disease and the employer is fearful that the employee also has or will have it. *Id.* The distraction category includes the firing of an employee who "is somewhat inattentive at work because his spouse or child has a disability that requires his attention, yet not so inattentive that to perform to his employer's satisfaction he would need an accommodation, perhaps by being allowed to work shorter hours." *Id.* This final example also points out a key aspect of the association provision of the ADA; there is no right to an accommodation. *Id.* ("The qualification concerning the need for an accommodation (that is, special consideration) is critical because the right to an accommodation, being limited to disabled employees, does not extend to a nondisabled associate of a disabled person.")

In the instant case, regarding Cavender's prima facie case, he easily satisfies the

second and third elements: he suffered an adverse employment action when Sunbelt

terminated his employment on January 16, 2007, and there is no dispute that Sunbelt

was aware that Cavender had a son with a disability.  This leaves prongs one and four

for consideration.  On prong one, Sunbelt claims that Cavender cannot prove that he

was qualified for the job because of his attendance problems.  Cavender, however,

points out that this argument is also the argument Sunbelt offers as the legitimate,

nondiscriminatory reason for termination, under the *McDonnell Douglas* burden-shifting

framework.  Therefore, Cavender urges the court to evaluate this prong in conjunction

with its argument for pretext in response to Sunbelt's legitimate, nondiscriminatory

explanation.  *See Vanasco v. National-Louis Univ.*, 137 F.3d 962, 966 (7th Cir. 1998).

The court will proceed at this point in the analysis, then, for purposes of argument, as

though Cavender were qualified, without making any final determination on the issue.

(If the court were to continue past the prima facie case, it would reconsider this prong in

conjunction with Cavender's argument for pretext; however, that is not necessary given

the next paragraph.)

At prong four, Cavender must show that he fits into one of the three categories.

Clearly he cannot be in the "expense" category since his son's medical costs were

through his wife's insurance.  There is also simply no evidence even suggesting

"disability by association."  Rather, Cavender argues that he falls into the "distraction"

category.  Cavender does not meet this category either.  As discussed in connection

with his FMLA claim, there are reasonable inferences to be made that he was fired

either because he took FMLA leave and/or because he had attendance problems.

There is no evidence that he was fired because he was associated with a disabled individual, particularly that Sunbelt fired him because he was distracted by his son's condition while at work.  His scenario actually seems to contradict the quintessential example from *Larimer* ("inattentive at work . . . yet not so inattentive that to perform to his employer's satisfaction he would need an accommodation, perhaps by being allowed to work shorter hours"), because Cavender *did* require an accommodation in the form of time off in order to care for his son.  Moreover, the evidence suggests that Sunbelt was quite tolerant to the extent Cavender may have been "distracted."  For example, McDonald was supportive of a fundraiser to defray the Cavenders' costs associated with their son by allowing Cavender to send an email to Sunbelt's employees informing them of the event and allowing Cavender to sell raffle tickets at work. Factually, Cavender's situation simply does not fit into a scenario encompassed by this "distraction" requirement.

Therefore, it appears that Cavender cannot meet prong four of the prima facie case for his claim under the ADA for association discrimination.  For these reasons, Sunbelt's motion for summary judgment will be **GRANTED** with respect to the ADA claim.

**V.  Conclusion**

In accordance with the above discussion, Defendant's Motion for Summary

-27-

Judgment with respect to all FMLA claims is **DENIED**.  The Defendant's Motion for Summary Judgment on the ADA association claim will be **GRANTED**.  Thus the only issues remaining for trial are Cavender's claims that Sunbelt violated the FMLA in terminating his employment on January 16, 2006.

ALL OF WHICH IS ENTERED this 22nd day of October 2007.

_____

John Daniel Tinder, Judge
United States District Court

Copies to:

Philip J. Gibbons Jr.
GIBBONS JONES, P.C.
pgibbons@gibbonsjones.com

Patricia J. Hill
SMITH GAMBRELL & RUSSELL LLP
pjhill@sgrlaw.com

Andrew G. Jones
HASKIN LAUTER LARUE & GIBBONS
ajones@hlllaw.com

David B. Wilford
SMITH GAMBRELL & RUSSELL LLP
dwilford@sgrlaw.com